[Cite as *State v. Hinton*, 2013-Ohio-3381.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY   COUNTY

STATE OF OHIO                           :
                                        :       Appellate Case No. 25634
    Plaintiff-Appellee              :
                                        :       Trial Court Case No. 12-CR-738
v.                                      :
                                        :
CHRISHANDA L. HINTON            :       (Criminal Appeal from
                                        :           Common Pleas Court)
    Defendant-Appellant             :
                                        :

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of August, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MATTHEW T. CRAWFORD, Atty. Reg. #0089205, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. #0074057, 120 West Second Street, Suite 400, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, P.J.

{¶ 1}   Defendant-appellant Chrishanda L. Hinton appeals from her conviction and sentence, following a no-contest plea, for Possession of Heroin, in an amount equaling or

exceeding one gram, but less than five grams, in violation of R.C. 2925.11(A), a felony of the fourth degree.   Hinton contends that the trial court erred by overruling her motion to suppress evidence, upon the ground that it was obtained as the result of an unlawful search and seizure.

{¶ 2}   We conclude that the trial court did not err in overruling Hinton's motion to suppress evidence.   Accordingly, the judgment of the trial court is Affirmed.

## I.   The Stop, Search and Seizure

{¶ 3}   Dayton Police Officer Mark Spiers was clearing a house alarm that had been triggered at 725 Homewood, in Dayton, at 1:30 p.m., at the end of February, 2012.   Spiers was a 32-year police veteran, with 29 years on the Dayton Police Force, and 3 years on the Centerville Police Force before that.   He had served in a drug unit for 8½ years during his time on the Dayton Police Force.   Spiers was a uniformed police sergeant, supervising uniformed patrol officers.   He was alone in his marked cruiser.

{¶ 4}   A man pulled up in a vehicle alongside Spiers in his cruiser, and told Spiers that a drug transaction was taking place on Richmond Avenue, about 1½ blocks from the intersection of Richmond and Hammond.   Spiers's current location was about "three or four doors" from that intersection.   The man told Spiers that he had seen the same individual making numerous drug transactions in the past, and had reported it several times, but that every time uniformed police had arrived to investigate, the person was either gone, or back inside the house.

{¶ 5}   The man described the seller as "a black female, short, but tends to dress as a male, short hair," "wearing a white tee shirt and baggy jeans."   The man said she was making

a deal with "occupants of a gray minivan."

{¶ 6} Spiers did not wait to get the informant's name and identifying information, because he wanted to get to the scene of the suspected drug transaction in time to investigate and take appropriate action. After calling for backup, Spiers drove to the intersection and turned onto Richmond.

{¶ 7} As soon as Spiers turned onto Richmond, he could see a van about a block and a half down the street, matching the description, and he could see a person, later identified as Hinton, matching the description of the drug seller, with her hands inside the vehicle. The van was about five feet away from the curb, and Hinton was at the driver's window, so that she was standing at about the middle of the street. Spiers testified that "all of it," meaning taking the report from the informant until he was in a position to see Hinton and the van, "took less than 30 seconds or so."

{¶ 8} As Spiers approached Hinton, she looked in his direction, saw him coming up the street, and immediately walked toward the sidewalk on the other side of Richmond from the van. The van pulled away. Later, however, the van returned.

{¶ 9} Spiers told Hinton to stop. He told her that he wanted to talk to her about standing in the middle of the street, a minor misdemeanor, and about a drug complaint.

{¶ 10} Spiers recognized Hinton, with whom he had dealt in the past on "drug activity type complaints." Spiers decided to pat Hinton down for weapons. He described the pat-down as follows:

> I just use the palm of my hands. I don't manipulate anything. I just pat
>
> the outer side of her clothing to make sure there's no bulges, anything that could

feel like it could be a weapon that could be used against me. Just to make sure that she had nothing in her waistband or her pants pockets.

{¶ 11} Spiers started the pat-down with Hinton's front pockets. He felt a baggie. At "about the same time," Hinton told Spiers, "it's just weed," referring to the baggie in her right front pocket.

{¶ 12} Spiers finished the pat-down, and then went to retrieve the baggie of marijuana. He described what happened next as follows:

Started to retrieve the marijuana. As I'm retrieving the marijuana from her pocket, there's a small coin pocket just above the right front pocket. During the pat-down, I didn't notice it. But as I was removing the bag of weed, I felt a hard irregular shaped object. I immediately recognized that to be chunked up illegal drugs, probably heroin.

{¶ 13} Spiers testified that he had made arrests with heroin before. On cross-examination, Spiers testified that the object in Hinton's coin pocket was the size of a marble.

{¶ 14} After seizing the heroin, Spiers arrested Hinton and advised her of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## II. The Course of Proceedings

{¶ 15} Hinton was charged by indictment with one count of Possession of Heroin (one to five grams), in violation of R.C. 2925.11(A), a felony of the fourth degree, and one count of Possession of Marijuana, in violation of R.C. 2925.11(A), a misdemeanor of the first degree.

She moved to suppress the evidence, contending that it was obtained as the result of an unlawful search and seizure.

{¶ 16} Following a hearing, the trial court overruled Hinton's motion to suppress. Thereafter, she pled no contest to Possession of Heroin, and the Possession of Marijuana charge was dismissed by the State. The trial court imposed community control sanctions, and suspended her driver's license for six months.

{¶ 17} From her conviction and sentence, Hinton appeals. The trial court stayed the execution of the sentence, pending appeal.

### III.   The Trial Court Did Not Err in Overruling Hinton's Motion to Suppress

{¶ 18} Hinton's sole assignment of error is as follows:

THE TRIAL COURT ERRED IN OVERRULING HINTON'S MOTION TO SUPPRESS.

#### A.   Spiers Had a Reasonable, Articulable Suspicion

#### Justifying a Brief Investigative Stop

{¶ 19} Hinton first argues that Spiers lacked a proper basis for stopping Hinton.

{¶ 20} The trial court found Spiers's testimony to be "entirely credible." The only other witness called at the suppression hearing was Antoinette Young, who was called by Hinton. Young testified that she was the driver of the van. She testified that she and her sister were talking with Hinton in front of Hinton's house. She had wanted to give Hinton some money and then leave. When Young saw the police cruiser approaching, she decided to turn the van around

and park properly on the other side of the street, which she did, because no parking was allowed on the side of Richmond that she was on. She testified that she gave Hinton about $1,670. She witnessed the pat-down, seizure, and arrest of Hinton.

{¶ 21} Taking Young's testimony at face value, and assuming that her interaction with Hinton was innocent, it is irrelevant. The issue is whether Spiers had a reasonable, articulable suspicion that Hinton was selling drugs, not whether Hinton was, in fact, selling drugs.

{¶ 22} Hinton argues that the information Spiers received from the man who told him that a person matching Hinton's description was presently involved in a drug transaction less than two blocks away is entitled to little or no weight, because it was an anonymous tip. But an anonymous tip provided to a police officer face-to-face has greater inherent trustworthiness than an anonymous tip provided over the telephone, as held in *Henness v. Bagley*, 644 F.3d 308, 318 (6th Cir.2011):

> There is a difference, however, between anonymous tips provided over the telephone and those given face-to-face with a police officer. An in-person tip gives the officer an opportunity to observe the informant's demeanor and credibility. *See United States v. Palos–Marquez*, 591 F.3d 1272, 1275 (9th Cir.2010); *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir.2009); *United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir.2004); *United States v. Romain*, 393 F.3d 63, 73 (1st Cir.2004). The in-person informant risks being held accountable for false information. *Palos–Marquez*, 591 F.3d at 1275; *Griffin*, 589 F.3d at 152; *Romain*, 393 F.3d at 73. Additionally, an in-person informant's proximity in time and space to the reported criminal activity indicates the

reliability of the tip, because it reflects that the informant acquired the information firsthand. *See United States v. Chapman*, 305 F.3d 530, 534 (6th Cir.2002).

{¶ 23} *See also* cases cited in 2 Wayne R. LaFave, *Search and Seizure* 796, fn. 517, Section 9.5(I) (5th Ed.2012).

{¶ 24} In the case before us, Spiers's informant would not likely have assumed that he was protected by anonymity from any adverse consequences that might follow from his making a false accusation. Spiers might already have recognized him; Spiers might at some subsequent time recognize him; and Spiers might have noted and recorded his license plate number.

{¶ 25} The information provided to Spiers was corroborated, at least to some extent, by what Spiers observed 30 seconds later. He saw a person, Hinton, standing in the middle of the street with her hands in the driver's window of a minivan. When Hinton noticed the police cruiser approaching, she walked away, and the van took off. Spiers testified concerning his conclusion:

> Q. After receiving the complaint and rounding the corner and observing what you observed, did you – in your experience and with your education, did you believe that a drug transaction was taking place?
>
> A. Yes.
>
> Q. Can you tell me why?

A. Just based upon my experience. This was the type of things we would normally see. Based on my experience and making drug buys,[1] normally, once they see the police approaching, it's a quick – break contact fairly quick, and the car normally takes off. The dealer

---

[1] Spiers had testified that he had made drug buys in the past, while working undercover.

normally walks away when they see a marked cruiser. So it's just from my experience and what I have witnessed personally. It appears that it could have been a drug transaction, yes.

{¶ 26} Spiers also testified as to the nature of that area:

Q. And have you patrolled in that particular area before?

A. The majority of my 29 years have been involved in the Fifth District either as uniformed officer, uniformed sergeant, or as a detective sergeant in the drug unit.

Q. What kind of area is it?

A. Unfortunately, this is a high crime area. We have a lot of drug transaction [sic], a lot of assaults. So I would classify it as a very high crime area. There's a lot of abandoned houses in that particular area and rental properties.

Q. And have you personally – as a police officer, have you personally dealt with those types of crimes in that particular area?

A. Yes.

{¶ 27} From the totality of the circumstances, including the information Spiers received from the man who pulled up alongside him, his personal familiarity with the area, his experience with illegal drug transactions, and his observation of Hinton and the van, we conclude that Spiers had a reasonable, articulable suspicion that he was observing a drug transaction in progress, justifying a brief investigative stop.

### B. Spiers Had a Reasonable Basis for a Pat-Down Search for Weapons

{¶ 28} Spiers was unable to identify a basis for his concern that Hinton might be armed beyond the fact that she was likely involved in a drug transaction:

Q. Did you – what – did she do anything specific that made you think that

she was armed and dangerous?

A. Yes.

Q. What was that?

A. Any time somebody is engaged in possible drug activity, you have to consider that they're possibly armed.

Q. Okay. Anything else?

A. Twenty-nine years of experience tells me that drugs and weapons go hand in hand. No, nothing else.

**{¶ 29}** Hinton cites *State v. Page*, 2d Dist. Montgomery No. 21638, 2007-Ohio-671, for the proposition that: "A frisk for weapons cannot be justified merely because an investigative stop for suspected drug dealing is legitimate under *Terry* [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]." The State cites *State v. Martin*, 2d Dist. Montgomery No. 20270, 2004-Ohio-2738,[2] for the proposition that: "An officer's fear of violence when investigating drug activity is a legitimate concern that will justify a pat-down search for weapons." Our holdings in *Page* and *Martin* are difficult to reconcile.

**{¶ 30}** *Terry v. Ohio*, itself, suggests a possible way to reconcile *Page* and *Martin*. In *Terry*, the Supreme Court of the United States opined that "it is reasonable to assume" that a daylight robbery "would be likely to involve the use of weapons." *Terry* at 28. Thus, the Supreme Court recognized that persons who are reasonably suspected to be involved in certain criminal occupations – the daylight robbery of a store being one of them – are inherently likely to

---

[2] The State actually cites *State v. Dickerson*, 179 Ohio App.3d 754, 2008-Ohio-6544, 903 N.E.2d 697 (2d Dist.), which in turn cites *Martin*. In *Dickerson*, however, there was an independent basis for suspecting that the defendant might have been attempting to conceal a weapon. *Id.* at ¶ 18.

be armed, justifying a pat-down search for weapons.

{¶ 31}   In *State v. Page*, the defendant was standing in a public place near a known drug dealer.   The known drug dealer was seen approaching the defendant "stealthily," and had a brief conversation.   *Id.* at ¶ 7.   The defendant was handcuffed and subjected to a pat-down search. *Id.*   Thus, the facts in *Page* suggest that the defendant was at most a customer, or prospective customer, of the drug dealer – a "retail" purchaser of illegal drugs.

{¶ 32}   In *Martin*, the defendant had entered a suspected crack house while police were inside investigating.   Because the defendant had entered without knocking, there was reason to believe that he was involved in the criminal drug sales that were suspected to have taken place in the house.   In other words, there was reason to believe that he was not a "retail" purchaser of illegal drugs, but someone involved in the enterprise of selling illegal drugs.

{¶ 33}   In the case before us, Hinton was reasonably suspected of being a seller of illegal drugs, not merely a retail purchaser for her own use.   As with daylight robbers of stores in *Terry*, we conclude that persons reasonably suspected to be involved in the criminal enterprise of drug trafficking (as opposed to mere purchasers of drugs for their own use) are sufficiently likely to be armed to justify a pat-down search for weapons.   Thus, we conclude that *State v. Page*, upon which Hinton relies, is distinguishable.

{¶ 34}   We conclude that Spiers had a reasonable concern that Hinton might be armed and dangerous, justifying a pat-down search for weapons.


### C.   The Seizure of the Marijuana and Heroin from Hinton's Person Was Justified by the Plain-Feel Doctrine

**{¶ 35}** When Spiers encountered the baggie containing marijuana, during his pat-down search, Hinton volunteered that: "It's just weed." This justified Spiers in concluding that the baggie he felt in Hinton's pocket was marijuana, since "weed" is common slang for marijuana. Spiers was therefore justified in seizing it.

**{¶ 36}** Hinton contends that it is not credible that Spiers could have concluded that the hard, irregular-shaped, marble-sized object he felt in Hinton's coin pocket, while he was seizing the marijuana, was an illegal drug. She cites *State v. Woods*, 113 Ohio App.3d 240, 680 N.E.2d 729 (2d Dist.1996) for that proposition.

**{¶ 37}** In *Woods*, the object in the defendant's coin pocket was less than one gram, the size of a "pebble," and the trial court failed to credit the officer's testimony that it was immediately obvious to him that the object was crack cocaine. We agreed with the defendant in that case that "the trial court was in the best position to weigh the credibility of [the officer]." *Id.* at 244.

**{¶ 38}** In the case before us, the trial court found Officer Spiers's testimony to be "very credible." The weight of the chunk of heroin was between one and five grams, and it was the size of a marble. We agree with the State that this case is distinguishable from *Woods*.

**{¶ 39}** We have held that the plain-feel doctrine announced in *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), requires only that, based upon the police officer's sense of touch, the criminal character of the object felt be probable, not certain, *State v. Dunson*, 2d Dist. Montgomery No. 22219, 2007-Ohio-6681, ¶ 20:

> Under the "plain feel" doctrine, the physical features of the article which are revealed to the officer through his sense of touch must cause the identity of the

article, and from that its criminal character, to be immediately apparent to the officer. However, it need only be probable – that is, more likely than not – that the article possesses that criminal character.

{¶ 40} Based upon Officer Spiers's testimony, which the trial court found credible, we conclude that his seizure of both the marijuana and the heroin was justified under the plain-feel exception to the warrant requirement.

{¶ 41} Hinton's sole assignment of error is overruled.

## IV. Conclusion

{¶ 42} Hinton's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

HALL and WELBAUM, JJ., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Matthew T. Crawford
Lucas W. Wilder
Hon. Steven K. Dankof